FILED

2022 Feb-22  PM 03:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| EDGAR EVANS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:19-cv-00769-SGC |
| | ) | |
| BIRMINGHAM HIDE & TALLOW | ) | |
| COMPANY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION**[1]

The plaintiff, Edgar Evans, initiated this matter by filing a complaint against his former employer, Birmingham Hide & Tallow Company, Inc. ("BHT"). (Doc. 1).[2] Evans asserts claims for race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and the Civil Rights Act of 1866, 42 U.S.C. § 1981, as well as age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621 ("ADEA"). Presently pending is BHT's motion for summary judgment, which is fully briefed and ripe for adjudication. (Doc. 32; *see* Docs. 33-34, 40-43). As explained below, BHT's motion for summary judgment is due to be granted in its entirety.

---

[1] The parties consented to magistrate judge jurisdiction under 28 U.S.C. § 636(c). (Doc. 16).

[2] Citations to the record refer to the document and page numbers assigned by the court's CM/ECF electronic document system and appear in the following format: Doc. __ at __.

## I.      SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the *Federal Rules of Civil Procedure*, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323.  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *See id.* at 324.

The substantive law identifies which facts are material and which are irrelevant.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence

is merely colorable, or is not significantly probative, summary judgment may be granted. *See id*. at 249.

## II.   SUMMARY JUDGMENT FACTS

BHT's business consists of two operations: (1) rendering animal by-products from meat and bone purchased from processing facilities and grocery stores; and (2) recycling grease and oil from restaurants. (Doc. 33 at 3). Greg Oxley, who was born in 1954, has been BHT's regional vice president since 2010; he is the sole decision maker regarding BHT drivers in this area. (*Id.*; *see* Doc. 40-1 at 2-4). In 2010, BHT hired Evans as a CDL Class B grease truck driver.[3] (Doc. 33 at 3). Evans, who is Black, was born in 1952. (*Id.*; Doc. 41 at 5).

BHT has an employment manual ("Manual"), which provides a progressive discipline policy for matters of conduct and employee competence. (*See* Doc. 34-11 at 17-18). The Manual also notes unsatisfactory job performance may result in termination without following the progressive discipline policy. (*Id.* at 17). BHT also has a Fleet Safety Training Manual ("FSTM") which applies to drivers. (Doc. 34-10 at 19-50). Regarding accidents, the FSTM states: "All accidents are subject to review. The process will determine whether progressive disciplinary action, up to and including termination, will be administered." (Doc. 34-10 at 35).

---

[3] Class B CDL drivers, like Evans, are qualified to drive grease trucks, which are used to collect grease and oil from restaurants. (Doc. 34-13 at 27). BHT uses tractor-trailers to collet meat and bone from processing facilities; a Class A CDL license is required to drive a tractor-trailer. (*Id.*)

Oxley is responsible for investigating traffic accidents involving BHT drivers. (*See* Doc. 40-1 at 2-3). Oxley's investigation includes determining whether the accident is a "major accident," which he testified is an accident which causes personal injury or damage to a third-party's property. (*Id.*; Doc. 34-9 at 12-13). If the investigation reveals an accident was "major" and the BHT driver was at fault, Oxley considers it to be a "chargeable accident"—one resulting in discipline for the BHT driver. (Doc. 34-9 at 12-13, 17). Conversely, Oxley testified he does not view fender benders on BHT property or spills from open-top tractor-trailers to be chargeable accidents. (*Id.* at 13-14, 26). Neither the Manual nor the FSTM distinguish between minor/major or chargeable/nonchargeable accidents; Oxley testified he exercises his discretion in making these determinations. (*Id.* at 13-15, 17).

It is uncontested that, over his eight years of employment with BHT, Evans had a total of five accidents that Oxley determined were chargeable.[4] On November 18, 2010, Evans struck and damaged a drive through sign at Rib-It-Up, which was a BHT customer. (Doc. 34-2 at 24). Oxley determined the accident was chargeable because Evans did not sufficiently check his surroundings. (*Id.*). On August 14, 2012, Evans hit and damaged a parked car while collecting grease from Ken's BBQ

---

[4] This does not include other accidents which Oxley determined were nonchargeable, including one in which Evans ran over and destroyed a box of ingredients at a customer's location. (*See* Doc. 34-9 at 20; Doc. 40-1 at 3; *see also* Doc. 34-7 at 7-8).

in Pinson.  (Doc. 34-2 at 32).  Oxley determined the accident was chargeable because Evans backed too close and did not leave sufficient room to clear the parked cars. (*Id.*).  On May 3, 2013, Evans struck and damaged a bollard at the Social Security Administration building in Birmingham.  (Doc. 34-3 at 7-18).  Oxley determined this was a chargeable accident in light of the police report's findings; he instructed Evans to exit his truck to make sure the bollards were lowered before he entered the premises in the future.  (*Id*. at 18). On February 6, 2017, after Evans finished collecting grease from the Grand Bohemian Lodge, the door to the kitchen caught his bumper as he was pulling away, damaging the door frame.  (Doc. 34-5 at 34). Oxley also determined this accident was caused by Evans's error.  (*See* Doc. 34-11 at 48; Doc. 40-1 at 3).

On August 28, 2018, Evans backed into an employee's vehicle at a Jack's in Tuscaloosa.  (Doc. 34-6 at 43).  Oxley determined the accident was chargeable because Evans did not look carefully while backing up.  (*Id.*).  At the end of Oxley's investigation report, he concluded BHT should terminate Evans due to the frequency of accidents he had.  (*Id.*).  On August 31, 2018, Oxley terminated Evans, saying it was because he had been involved in "too many accidents."  (Doc. 34-7 at 10). Evans was 65 when he was fired.

During Evans's employment at BHT, Oxley sometimes referred to him as "Old Man."  (*See* Doc. 34-8 at 6; Doc. 34-7 at 8).  Oxley testified the moniker was

in jest because he and Evans were roughly the same age. (Doc. 34-9 at 44). Evans also testified that Oxley "jokingly" called him Old Man, but Evans did not find it humorous. (Doc. 34-8 at 6). When Evans turned 65 in December 2017, Oxley asked him about his retirement plans, saying "Old man, how long are you going to work?" (Doc. 34-8 at 5; Doc. 34-7 at 8). When Evans responded he intended to keep working, Oxley asked him to let him know when he planned to retire so he could hire another driver to cover his routes. (Doc. 34-8 at 19; Doc. 34-7 at 8). Evans testified Oxley again asked him about his retirement plans on "a couple" of occasions within the two or three months prior to his termination. (Doc. 34-8 at 5).

The evidence shows that after Evans was terminated BHT struggled to service the customers on his former routes. (*See* Doc. 34-12 at 5-8). The parties disagree regarding whether BHT replaced Evans. BHT contends it did not hire another Class B grease truck driver until it purchased a competitor and restructured all of its route assignments in April 2019—six months after Evans's termination. (Doc. 33 at 22-25; Doc. 43 at 10-11; Doc. 40-1 at 4). Instead, BHT asserts that until March 2019, it reassigned the vast majority of Evans's former routes to Class B drivers it employed prior to his termination. (*Id*.). Meanwhile, Evans contends BHT replaced him with two younger drivers: Jonathan Russel and Jonathan Rogers. (Doc. 41 at 10-11). The dispute over Evans's replacement will be discussed in more detail

below, with regard to his age discrimination claim.[5]

## III.   DISCUSSION

Evans asserts claims for discrimination on the basis of race and age.  Because there is no direct evidence of age or race discrimination,[6] the claims are subject to the familiar *McDonnell Douglas* framework.  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (*McDonnel Douglas* applies to both Title VII and § 1981 claims); *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 141–42, (2000) (noting application of *McDonnell Douglas* to ADEA claims).[7]

Under the *McDonnell Douglass* framework, the plaintiff must satisfy his *prima facie* case to create an inference of discrimination.  *E.g. Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1227 (11th Cir. 1993).  Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment decision.  *Id.*  This burden involves no credibility determination, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509

---

[5] Evans does not claim Rogers or Russel were members of a different race.  (Doc. 41 at 11; *see id.* at 12-26).

[6] Evans acknowledges the lack of direct evidence to support his claims.  (Doc. 41 at 27).

[7] Evans may also satisfy his *prima facie* case by presenting "enough circumstantial evidence to raise a reasonable inference of intentional discrimination."  *Hamilton v. Southland Christian Sch., Inc.,* 680 F.3d 1316, 1320 (11th Cir. 2012); *see Smith v. Lockheed Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011).

(1993), and has been characterized as "exceedingly light," *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983). As long as the employer articulates a "clear and reasonably specific" non-discriminatory basis for its actions, it has discharged its burden of production. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 258 (1981).

If an employer articulates one or more legitimate, nondiscriminatory reasons for the employment action, the plaintiff must show the proffered reason was pretext for illegal discrimination. *Chapman v. AI Transp.*, 229 F.3d 1012, 1024-25 (11th Cir. 2000). If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot quarrel with the wisdom of the reason, but instead must "meet that reason head on and rebut it." *Id.* at 1030. To demonstrate pretext, the plaintiff must show the proffered reason was false and that discrimination was the real reason for the employer's action. *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1163 (11th Cir. 2006).

To make his *prima facie* case as to either of his claims, Evans must show: (1) membership in a protected class; (2) qualification for his position; (3) an adverse employment action; and (4) replacement by a person outside his protected class or less favorable treatment than a similarly-situated individual outside his protected class. *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003) (Title VII claim); *Chapman*, 229 F.3d at 1024 (ADEA claim). Here, Evans satisfies the first

three requirements; the parties dispute whether Evans satisfies the fourth.  The *prima facie* cases for Evans's claims are analyzed in turn.

### A.   *Prima Facie* Case of Racial Discrimination

To show disparate treatment on the basis of his race, Evans points to comparator evidence showing White BHT drivers with similar or worse accident histories were not terminated.  (Doc. 41 at 14-19).  To make a *prima facie* case of disparate treatment via comparator evidence, Evans must point to different treatment of employees outside his protected class to whom he is "similarly situated in all material respects."  *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1224 (11th Cir. 2019).  A comparator need not be identical to the plaintiff except for protected status, and differences in formal titles or duties do not disqualify a purported comparator. *Id*. at 1227.  However, as relevant here, a valid comparator ordinarily "will have engaged in the same basic conduct (or misconduct) as the plaintiff" and "will share the plaintiff's employment or disciplinary history."  *Id.* at 1227-28.  In short, "a plaintiff and her comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'"  *Id.* at 1228 (quoting *Young v. United Parcel Serv., Inc.,* 575 U.S. 206 (2015)).  Additionally, a plaintiff must show the decision maker had actual knowledge of a comparator's similar misconduct but did not discipline them similarly.  *Summers v. City of Dothan*, 444 F. App'x 346, 348 (11th Cir. 2011).

Here, Oxley fired Evans after his fifth chargeable accident in eight years. Evans identifies Levi Williamson, Stewart Edwards, Tyler Daniel, and John Abbot—all White—as comparators. (Doc. 41 at 14-17). As explained below, Evans is not similarly situated to his proposed comparators because none of them had as many chargeable accidents as he did over a similar period of time.

Levi Williamson is a former BHT grease truck driver. (Doc. 41 at 14-15). Williamson was involved in two accidents between 2010 and 2013. (Doc. 34-9 at 72-74). Oxley testified one of the accidents—in which Williamson damaged the lid to a customer's septic tank—was not chargeable because the unmarked, buried septic tank was located in a grass-covered parking lot and the lid was obscured by grass. (*Id.* at 72-73). Evans also testified Williamson pulled down a chain link fence at a Jack's location somewhere in north Alabama. (Doc. 34-7 at 16). As to the accident involving the fence at Jack's, Oxley testified he was never aware of it. (Doc. 34-9 at 72-73; Doc. 34-10 at 1). Accordingly, Williamson is not similarly situated to Evans with regard to the number of accidents. Evans has not offered anything to show: (1) Oxley's decision not to charge Williamson for running over a hidden septic system was unreasonable; or (2) Oxley knew about damage to the fence at Jack's. And even crediting Evans's testimony regarding the accident at Jack's, it would constitute one instance of Williamson being at fault for damaging a customer's property; Evans did so on five occasions. The undisputed facts show

Williamson did not have a history of multiple at-fault accidents which damaged customers' property; BHT reasonably distinguished between him and Evans on that basis. *Lewis*, 918 F.3d at 1224. Accordingly, Williamson is not a suitable comparator.

The foregoing rationale also applies to Stewart Edwards and Tyler Daniel, both of whom had fewer accidents than Evans. Edwards had two chargeable accidents over several years but was not terminated. (Doc. 34-9 at 53; *see* Doc. 34-11 at 50). This is not similar to Evans's history of five chargeable accidents. Similarly, Evans credits Daniel with two at-fault accidents. (Doc. 41 at 15). BHT explains these two accidents were actually attributable to two drivers with similar names: Tyler Daniel and Joshua Tyler Daniel. (Doc. 43 at 11 n.7; *see* Doc. 42-1 at 1). Evans has offered no evidence to overcome BHT's showing that each Mr. Daniel had one on-the-job accident, four fewer than Evans. Accordingly, these BHT drivers—who had fewer accidents than Evans—are not suitable comparators.

Evans also points to John Abbott as having six accidents without being terminated. (Doc. 41 at 16-17). Specifically, Evans notes Abbott had: (1) a 2018 accident in which he hit a car hauler loaded with Corvettes, causing personal injury and significant property damage and resulting in litigation; (2) an accident between 2016 and 2018 in which he hit another BHT truck in BHT's yard; (3) an accident in December 2018 in which he hit a BHT employee's personal vehicle in BHT's yard;

(4) an accident in which a vehicle ran off the road and flipped in the median near Academy Drive; (5) an instance in which he spilled raw meat from a fat and bone tractor-trailer at a customer's facility in Decatur; and (6) an instance in which he spilled blood at a customer's facility in Steele.  (Doc. 41 at 16).

BHT notes that, of the six accidents Evans attributed to Abbott, Oxley only charged him with one: the 2018 accident in which he hit the car hauler loaded with Corvettes.  (Doc. 33 at 16; Doc. 34-10 at 13).  Oxley determined the other accidents were not chargeable.  First, the employee vehicle Abbott hit in December 2018 was improperly parked in BHT's yard by the employee's son; the employee considered the accident to be his son's fault.  (Doc. 34-10 at 13).  Next, with regard to the accident near Academy Drive, it occurred on July 30, 2018, when Abbott was driving slowly in congested traffic on Interstate 59 in Bessemer.  (Doc. 34-6 at 41).  A witness described the accident as occurring when a pickup approached from behind, "flying up on traffic."  (*Id.* at 42).  The driver of the pickup tried to pass Abbott in the median to avoid a collision but hit the guard rail, bounced into Abbott's rear wheel, went airborne, and landed upside down in the oncoming lane.  (*Id.* at 41-42).  The driver of the pickup was ticketed for not having a license, registration, or insurance.  (*Id.* at 41).  Oxley reasonably determined Abbott was not at fault and did not consider this to be a chargeable accident.  (*Id.* at 41).

The remainder of Abbott's accidents fall into categories Oxley typically does

not consider chargeable: collisions on BHT property and spills from open-top fat and bone trucks.  (Doc. 40-1 at 3; Doc. 34-9 at 13-14, 25-26, 39-40).  Accordingly, Abbott, who had one chargeable accident, is not similarly situated to Evans. Additionally, Abbott drove BHT trucks for fourteen years, nearly twice as long as Evans.  (*See* Doc. 40-2 at 11).  Accordingly, even if all of Abbott's accidents had been chargeable, they would be less frequent than Evans's accidents.  For all of the foregoing reasons, Abbot is not similarly situated to Evans.

As to all of his proposed comparators, Evans contends Oxley's distinction between chargeable and non-chargeable accidents is arbitrary and subjective, making it impossible to fairly compare driving records with other BHT employees. (Doc. 41 at 17, 23).  However, even ignoring Oxley's chargeable/nonchargeable dichotomy, Evans had more frequent accidents than any of his comparators. Crediting Evans's testimony in this regard, Williamson and Edwards both had two accidents, while Tyler Daniel and Joshua Tyler Daniel each had one.  And while Abbott had a total six chargeable and nonchargeable accidents, they occurred over fourteen years, nearly twice as long as it took Evans to rack up the same number.[8] Accordingly, Evans's proposed comparators are not "sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'"  *Lewis*, 918 F.3d at

---

[8] Ignoring the distinction between chargeable and nonchargeable events, Evans would have at least six, accounting for his nonchargeable accident at a customer's location.

1228 (quoting *Young,* 575 U.S. 206).   For the foregoing reasons, Evans cannot satisfy his *prima facie* case of racial discrimination via comparator evidence. Moreover, intuitively, it is not unreasonable for a business to view accidents which damage a customer's property due to driver error differently than fender-benders between company owned vehicles or spills from open-top trucks.

Finally, Evans also contends his claims should survive because he has presented a convincing mosaic of circumstantial evidence showing racial discrimination.   (Doc. 41 at 19-22).   Evans's argument in this regard relies on statistical evidence.   (*Id.* at 21-22).[9]   In particular, Evans notes that from 2009 until 2019, BHT had 66 employees, consisting of 37 White employees and 29 Black employees.   (Doc. 41 at 22).   During this time, BHT fired 13 Black employees and 11 White employees.   (*Id.*).   Evans notes that, despite having a majority White workforce, BHT fired more Black employees.   (*Id.*).   As to the five BHT drivers fired due to accidents during that time, Evans notes three were Black and two were White.   (*Id.*).   This arithmetic constitutes the entirety of Evans's argument regarding this statistical information; he contends it contributes to an inference of racial discrimination.   (*Id.*).

---

[9] Evans also asserts the convincing mosaic standard is bolstered by BHT's failure to follow its own policies and its provision of shifting reasons for his termination.  (Doc. 41 at 15, 17-18, 20-21). These arguments are a better conceptual fit with the question of pretext; they are addressed *infra*. However, the same rationale explained there would apply equally if discussed here.

14

As Evans candidly acknowledges, statistics derived from a small sample size, like the one at issue here, are of limited use.  (Doc. 41 at 21); *see Ducksworth v. Strayer Univ., Inc.,* No. 16-1234-JEO, 2010 WL 1897278, * 14 (N.D. Ala. April 29, 2019)  Additionally, "[s]tatistics without a proper analytic foundation are virtually meaningless."  *Burke-Fowler v. Orange Cty., Fla,* 447 F.3d 1319, 1325 (11th Cir. 2006).  Evans offers no substantive argument or expert interpretation regarding why the ratio of fired BHT drivers is statistically significant.  *See id.*  Accordingly, the statistical evidence is not probative of racial discrimination.  Evans's argument that these numbers support his *prima facie* case fails.

For the foregoing reasons, even construing the facts in the light most favorable to Evans, he cannot satisfy his *prima facie* case of racial discrimination; nor has he presented a convincing mosaic of circumstantial evidence.

## B.     *Prima Facie* Case of Age Discrimination

As with Evans's race discrimination claim, the parties disagree about the fourth element of his *prima facie* case for age discrimination: replacement by, or less favorable treatment than, a similarly-situated individual outside his protected class. To the extent Evans relies on Williamson and/or Edwards as younger comparators (*see* Doc. 41 at 14-15), they are not similarly situated for the reasons discussed in the context of the race-based claim.  As previously mentioned, the parties dispute whether Evans was replaced.

Evans contends he was replaced by two younger drivers: (1) Jonathan Russel in October 2018; and (2) Jonathan Rogers in November 2018.  (Doc. 41 at 29; *see* Doc. 34-13 at 28).  At the time of their hires, both Russel (55 years old) and Rogers (27 years old) were appreciably younger than Evans.  (Doc. 34-11 at 50).  During the months following Evans's termination, BHT emails reflect the company had trouble consistently servicing the customers on Evans's old routes; multiple customers complained between September 2018 and January 2019.  (Doc. 34-12 at 5-8).  In a September 18, 2018 email, BHT's Lynn Webber stated Evans would be replaced by a new hire who would start in two weeks and that he would try to hire an additional driver as well.  (Doc. 34-12 at 16).  In a January 16, 2019 email, Webber again claimed to be hiring one driver to replace Evans and stated he had talked to another potential hire that morning.  (Doc. 34-12 at 8).

BHT maintains it never hired a driver to replace Evans, instead relying on its existing grease truck drivers to cover Evans's routes, in addition to their regular routes.  (Doc. 33 at 22-25; Doc. 43 at 10-11; *see* Doc. 34-13 at 27).  To support this contention, BHT presents evidence that, of the 118 times BHT assigned drivers to run Evans's old routes from his termination through March 2019, Russel and Rogers were only assigned to the routes a total of 15 times.  (Doc. 34-14 at 4-6).  Rogers and Russel were Class-A CDL drivers; they occasionally filled in as-needed to drive grease trucks on Evans's old routes.  (Doc. 34-13 at 27, 35).  Also supporting BHT's

16

version of events are emails to and from Webber showing BHT supervisors reassigning Evans's old routes to other, existing BHT grease truck drivers in the months following his termination.  (Doc. 34-12 at 4, 11-12, 15).  Accordingly, while Webber's emails stated Evans would be replaced by new employees, it appears that never occurred.  Indeed, the very emails upon which Evans relies to show he was replaced reflect that Webber was still trying to fill his position in January 2019, well after Russel and Rogers were hired.  (Doc. 34-12 at 8) (January 16, 2019 email to Webber stating, "This Popeye's is just another example of why we need a full-time grease driver to fill [Evans's] position").

Oxley avers that, in April 2019, BHT purchased a competitor, W.B. Riggins. (Doc. 40-1 at 4).  BHT subsequently hired two former W.B. Riggins drivers; one was 60 (5 years younger than Evans) and the other was 73 (8 years older than Evans). (*Id.*).  At that point, BHT restructured all of its grease truck routes to account for the additional customers it acquired from W.B. Riggins.  (*Id.*).  As a result, Evans's old routes ceased to exist.  (*Id.*).  Evans has not offered any evidence to refute the foregoing evidence.  Accordingly, the undisputed facts show BHT did not replace Evans with Russel and Rogers; these are the only individuals Evans identifies as his replacements.  (Doc. 41 at 29).

Neither does a convincing mosaic of circumstantial evidence support Evans's ADEA claim.  Because Evans was not replaced, the only possible circumstantial

evidence of age discrimination is that Oxley called him "Old Man" and asked him about his retirement plans.[10]  Here, Oxley testified he called Evans "Old Man" as a joke because he was only two years younger; Evans also testified Oxley used the nickname jokingly, although he did not find it amusing.  Importantly, Evans does not allege Oxley used the moniker in a negative way or that he referred to his age at all while disciplining or terminating him.  *See Kilgore,* 646 F. App'x at 774 (supervisor saying employee was "a stubborn, old woman," "too old," an "old lady," and the "wrong color" was circumstantial evidence of discriminatory intent where "many of these comments occurred in the context of discussing work-related or disciplinary matters"); *Mora v. Jackson Mem'l Found., Inc.,* 597 F.3d 1201, 1204 (11th Cir. 2010) (supervisor saying employee was "too old" could be circumstantial evidence); *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1501 (11th Cir. 1991) (same).

The closest Evans comes to showing a connection between Oxely's reference to his age and a work-related endeavor was the first time Oxley inquired about his retirement plans, on or about his 65th birthday; Oxley asked Evans, "Old man, how long are you going to work?"  (Doc. 34-8 at 5; Doc. 34-7 at 8).  When Evans told

---

[10] As previously mentioned, Evans forthrightly acknowledges that Oxley's "Old Man" moniker does not constitute direct evidence of age discrimination.  (Doc. 41 at 27) (citing *Kilgore v. Trussville Dev., LLC*, 646 F. App'x 765 (11th Cir. 2019) (referring to an employee as old or "old lady" could constitute circumstantial evidence of discriminatory intent).

Oxley he intended to keep working, Oxley said to warn him if he decided to retire so BHT would not be left in the lurch without a driver. Thus, Evans's own testimony shows Oxley's questions regarding retirement were driven by staffing concerns. The ADEA does not prohibit employers from making employment decisions that correlate with age, including engaging in conversations about retirement plans. *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 613 (1993); *see Rowan v. Lockheed Martin Energy Sys., Inc.,* 360 F.3d 544, 548 (6th Cir. 2004); *Lewis v. St. Cloud State Univ.*, 467 F.3d 1133, 1137 (8th Cir. 2006) ("reasonable inquiries into an employee's retirement plans do not permit an inference of age discrimination"). The fact that Oxley's otherwise legitimate inquiry regarding Evans's retirement plans was preceded by his joking moniker of "Old Man" does not, by itself, create a convincing mosaic of discrimination, nor does the fact that Oxley asked about retirement another "couple" of times in the two or three months prior to Evans's termination.

Indeed, all of the other evidence points in the opposite direction. As previously mentioned, Oxley was only two years younger than Evans. *See LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 847 (1st Cir. 1993) (plaintiff fired by supervisor who was a year older supported inference that age was not a factor in the termination). Similarly, Abbott, whom Evans proposes as a comparator for his race-based claims, was only one year younger than Evans, yet was not terminated after several nonchargeable accidents. (*See* Doc. 34-7 at 11-12). Additionally, after BHT

bought W.B. Riggins, it hired two of its former drivers; both were over 60, and one was eight years older than Evans.  All of this undermines the theory that BHT terminated Evans due to his advanced age.

For all of the foregoing reasons, Evans cannot satisfy his *prima facie* case for age-based discrimination, even viewing the facts in the light most favorable to him. Similarly, there is no convincing mosaic of circumstantial evidence to support this claim.

### C.   <u>Pretext</u>

Even if Evans could satisfy the *prima facie* case for either of his claims, BHT has offered a legitimate, non-discriminatory reason for terminating him: having five chargeable accidents on customer property in eight years.  As explained below, Evans cannot show that BHT's stated, valid reason for his termination was pretext for invidious age or race discrimination.  Evans argues BHT: (1) gave inconsistent reasons for his termination; (2) deviated from its own policies; and (3) used arbitrary and subjective criteria to assess his driving record.  (Doc. 41 at  23, 25-26; *see id.* at 15, 17-18, 20-21).

 Evans's contention that BHT's rationale changed over time is based on purportedly different formulations of the number and type of accidents justifying his termination.  (Doc. 41 at 9-10, 14-15, 25).  Evans relies on Oxley's statements when he terminated Evans, emails between Oxley and BHT's Cleve McDaniel regarding

Evans's subsequent unemployment claim, and Oxley's testimony and affidavit here. (*Id.*).

Following Evans's August 28, 2018 accident—his fifth—Oxley reported to McDaniel on the same day that he intended to fire Evans for making "to[o] many mistakes." (Doc. 42-2 at 1). The conclusion of Oxley's investigation report for Evans's final accident stated: "This is a CHARGABLE ACCIDENT, with as many accidents that Edgar has had in the past I feel it is necessary for BHT to Terminate Edgars [sic] employment." (Doc. 34-6 at 43). Copies of the other four accident reports were attached to the final report. (*See id.*; Doc. 34-9 at 29; Doc. 42-3 at 1-7; Doc. 42-4 at 1-7). Evans testified Oxley stated it was because he had "too many accidents when he was terminated on August 31, 2018." (Doc. 34-7 at 10; *see* Doc. 34-9 at 29).

After Evans made an unemployment compensation claim, the Alabama Department of Labor sent BHT a form notifying it of the claim and requesting information regarding his separation. (Doc. 42-5). McDaniel completed the form, noting Evans was discharged due to the August 28, 2018 accident after having been given written warnings for the accidents in 2010, 2012, 2013, and 2017. (*Id.*). Under Alabama law, a discharged employee cam be ineligible for unemployment compensation if they were fired for misconduct. ALA. CODE § 25-4-78(3). BHT did not contend Evans was ineligible for unemployment, but Evans apparently reported

the reason for his termination as "discharge for misconduct" when he made the claim. (Doc. 42-5). An official from the unemployment office called McDaniel, repeatedly requesting the policy under which Evans was terminated. (Doc. 34-11 at 1). Eventually, McDaniel stated any combination of two accidents or moving violations in three years was cause for dismissal. (*See id.*).[11]

Once Evans made a charge of discrimination with the EEOC, Oxley's declaration stated he was fired due to having a "history" of accidents, and he specifically identified Evans's five chargeable accidents. (Doc. 34-11 at 48). BHT's EEOC position statement also cited Evans's history of five at-fault accidents. (Doc. 38-3 at 3-5). Here, Oxley testified he terminated Evans due to having too many accidents. (Doc. 34-10 at 6; *see* Doc. 40-1 at 4; Doc. 34-9 at 29). The undisputed facts support the conclusion that no other BHT driver had as many frequent chargeable accidents as Evans.

The foregoing contradicts Evans's contention that BHT's reasons for firing him changed over time. Indeed, BHT has consistently cited a history of accidents as the reason for termination; most often BHT cited the same five chargeable accidents described in this opinion. Much of Evans's argument appears to come from McDaniel's citation of the non-existent policy—that two accidents in three

---

[11] It appears McDaniel thought this was the policy under the FSTM. (Doc. 34-11 at 1). Actually, the FSTM states the following conditions preclude commercial driving: (1) three or more moving violations in three years; or (2) two or more moving violations in one year. (Doc. 34-10 at 23).

years was cause for termination—in response to queries from the official from the unemployment office.  (*See* Doc. 41 at 20).[12]  However, this does not cast doubt on the conclusion that Evans was fired due to repeated at-fault accidents.  Indeed, McDaniel's earlier correspondence with the Department of Labor cited Evans's five accidents.  For the foregoing reasons, BHT's rationale for terminating Evans has remained virtually uniform, and any minor variations in the repeated iterations of that rationale are too insignificant to show pretext.

Next, Evans contends his termination was contrary to BHT policy.  Evans relies on the failure to follow the progressive discipline policy in the Manual and the fact that Oxley's chargeable/nonchargeable accident distinction does not appear in the Manual or the FSTM.  (Doc. 41 at 5, 20-21, 25-26).  Regarding the progressive discipline policy, the Manual notes unsatisfactory job performance may result in termination without following the progressive discipline steps.  (Doc. 34-11 at 17).  The FSTM, which applies to drivers and specifically addresses accidents, does not include a progressive discipline policy and explicitly states accidents can result in termination.  (Doc. 34-10 at 35).  Accordingly, BHT's termination of Evans without first administering progressive discipline accords with the employment policies in the Manual and the FSTM.

---

[12] Importantly, McDaniel did not make the decision to fire Evans.  The undisputed facts show this decision was Oxley's alone.

As to Oxley's distinction between chargeable and nonchargeable accidents, it is true that this terminology is not used in the FSTM.  Likewise, the FSTM does not carve out spills as non-accidents, and it does not distinguish accidents on company property from other accidents.  However, a primary concern in the FSTM is avoiding preventable accidents—an accident a BHT driver could have avoided.  (Doc. 34-10 at 34).  While Oxley's accident investigation process does not strictly conform to the FSTM in all respects, a key component of Oxley's evaluation is whether the BHT driver was at fault or could have prevented an accident.  Indeed, where a BHT driver was not at fault, Oxley determined the accident was nonchargeable.

More importantly, BHT has presented evidence showing Oxley—who is the sole decision maker regarding hiring, disciplining, and firing BHT drivers—applied his accident evaluation process uniformly to the drivers he supervised.  (Doc. 34-9 at 11-12; Doc. 40-1 at 3).  Crucially, Evans has presented no evidence to show Oxley applied a different accident evaluation process to younger, White drivers.  Deviation from company policy, without more, is insufficient to show pretext for discrimination.  *Sheppard v. Sears, Roebuck & Co.*, 391 F. Supp. 2d 1168, 1181 (S.D. Fla. 2005); *see Berg v. Fla. Dep't of Lab. and Emp. Sec.*, 163 F.3d 1251, 1255 (11th Cir. 1998) (deviation from company policy, absent additional showing that deviation benefitted non-protected workers, does not constitute circumstantial evidence of discrimination).

24

Neither does Oxley's application of subjective criteria to determine chargeability show pretext. *Denney v. City of Albany*, 247 F.3d 1172, 1185 (11th Cir. 2001). "Absent evidence that subjective [] criteria were used as a mask for discrimination, the fact that an employer based a [] decision on purely subjective criteria will rarely, if ever, prove pretext under Title VII or other federal employment discrimination statutes." *Id.* Evans has not presented evidence to show the foregoing. Indeed, the evidence tends to show the opposite is true; Evans benefitted on at least one occasion from Oxley's decision not to charge him for an accident..

The remainder of Evans's arguments amount to claims that Oxley's accident investigation criteria are unreasonable. At various points, Evans contends it is unreasonable for Oxley: (1) to distinguish accidents based on whether they occur on BHT property; (2) to differentiate spills from accidents; and (3) to fail to account for the amount of property damage a chargeable accident caused. (*See* Doc. 41 at 16-21, 25-26). However, these assertions are nothing more than arguing with the wisdom of Oxley's approach. These arguments do not meet BHT's valid reason for terminating Evans—five chargeable accidents in eight years—"head on and rebut it." *Chapman.,* 229 F.3d at 1025. A reasonable employer could be motivated to fire a driver like Evans, who had frequent and repeated at-fault accidents; the undisputed facts here show Evans had more frequent at-fault accidents than any other BHT driver. *See id.* at 1030. Moreover, the undisputed facts do not show, or even suggest,

that discriminatory animus—either on the basis of race or age—motivated BHT's decision to terminate Evans.

For the foregoing reasons, even if Evans could satisfy his *prima facie* burden of showing age- or race-based discrimination, he cannot show BHT's proffered, legitimate reason for his termination was pretext for discrimination.

## IV.   CONCLUSION

For all of the foregoing reasons, viewing the facts in the light most favorable to Evans, there are no genuine issues of material fact, and BHT is entitled to judgment as a matter of law.  Accordingly, BHT's motion for summary judgment will be granted in its entirety, and all of Evans's claims will be dismissed with prejudice.  (Doc. 32).  A separate order will be entered.

**DONE** this 22nd day of February, 2022.

STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE